ROBERT C. LONON AND LINDA C. LONON, PLAINTIFFS v. THOMAS LEE
TALBERT, III, AND THE CITY OF CHARLOTTE, A NORTH CAROLINA
MUNICIPAL CORPORATION, DEFENDANTS

No. 9026SC343

(Filed 20 August 1991)

1. **Municipal Corporations § 15 (NCI3d)— automobile accident at intersection—temporary traffic controls—negligence of city**

    Plaintiffs' evidence was sufficient to withstand the city's motions for directed verdict and judgment n.o.v. as to breach of duty in an action arising from an automobile-motorcycle collision at an intersection with temporary traffic controls. While a municipality cannot be held liable for failure to design, install and maintain a traffic control device unless its actions are so unreasonable as to constitute an abuse of discretion, a municipality which is under a duty to conform its traffic control devices to the Manual on Uniform Traffic Control Devices (MUTCD) and which has also waived immunity for civil liability is subject to liability. Defendant city has adopted an ordinance mandating compliance with the MUTCD, and plaintiffs' evidence suggested that the device here did not conform to MUTCD requirements.

    **Am Jur 2d, Highways, Streets, and Bridges § 491.**

    **Liability of highway authorities arising out of motor vehicle accident allegedly caused by failure to erect or properly maintain traffic control device at intersection. 34 ALR3d 1008.**

2. **Municipal Corporations § 16 (NCI3d)— automobile accident at intersection—liability of city—negligence of driver**

    The trial court did not err by denying defendant city's motions for a directed verdict and judgment n.o.v. on the issue of insulating negligence in an action arising from an automobile-motorcycle collision at an intersection with temporary traffic controls. Although defendant city contended that it was entitled to benefit from an approaching motorist's right to assume that all other travelers will observe the law and not turn left until the movement can be made in safety, the city was not in the position of the approaching driver. The expert testimony left room for reasonable minds to differ as to whether

LONON v. TALBERT

[103 N.C. App. 686 (1991)]

the driver's negligent execution of the left turn insulated any negligence on the part of the city.

**Am Jur 2d, Highways, Streets, and Bridges § 377.**

3. **Municipal Corporations § 16 (NCI3d)— automobile accident at intersection—liability of city—instruction on insulating negligence—not sufficient**

The trial court erred in an action arising from an automobile-motorcycle collision at an intersection with temporary traffic controls by not instructing the jury on the doctrine of insulating negligence as requested by the city. The jury instruction on proximate cause mentioned foreseeability one time and gave little explanation as to the meaning of that term; the jury may have reached a different result with proper instructions on insulating negligence.

**Am Jur 2d, Highways, Streets, and Bridges § 377.**

APPEAL by defendant City of Charlotte from judgment entered 24 October 1989 by *Judge Marvin K. Gray* in MECKLENBURG County Superior Court. Heard in the Court of Appeals 23 October 1990.

*Bailey, Patterson, Caddell & Bailey, P.A., by Jerry N. Ragan and Michael A. Bailey, for plaintiff-appellees.*

*Frank B. Aycock, III, for defendant-appellant City of Charlotte.*

*Parker, Poe, Adams & Bernstein, by Max E. Justice and David N. Allen, for defendant-appellant City of Charlotte.*

PARKER, Judge.

Plaintiffs instituted this personal injury action against defendant Talbert to recover damages arising out of a motorcycle-automobile accident at the intersection of Fairview Road with a driveway giving access to the Sears Automotive Center at Southpark Mall in Charlotte ("Sears intersection"). Later plaintiffs amended their complaint to join as a party defendant the City of Charlotte ("City"). Plaintiffs alleged that various acts by City in connection with a temporary traffic control system at the Sears intersection constituted negligence which proximately caused plaintiff Robert Lonon's injury. Upon finding both defendants negligent, a jury awarded plaintiffs the sum of $8,702,312.42. Defendant City appealed, assigning as error the denial of its motions for directed verdict, judgment

notwithstanding the verdict, and new trial. We hold defendant City's motion for directed verdict and judgment notwithstanding the verdict were properly denied but award a new trial on account of error in the jury instructions.

At least as early as 1985, City's Transportation Department was aware of traffic problems and congestion on Fairview Road in the Southpark Mall area. At the Sears intersection, Fairview Road consisted of seven lanes, namely three eastbound through lanes, three westbound through lanes, and a center storage lane for left turns. Eastbound traffic was separated from westbound traffic by a narrow concrete median; an opening in the median accommodated turning traffic. The Sears intersection was not protected by a traffic control signal; but the intersections immediately to the east and west were so protected. To the west of the Sears intersection was the Barclay Downs-Telstar intersection. West of this intersection Fairview Road narrowed to four lanes. To the east of the Sears intersection was a Southpark Mall entrance intersection.

To ease congestion, City's Transportation Department planned to widen Fairview Road west of Barclay Downs-Telstar and later install a median on it from the Barclay Downs-Telstar intersection all the way east to Sharon Road. Traffic planners were also aware that during peak morning hours, left turns at the Sears intersection were dangerous: Westbound through traffic on Fairview Road, slowed by the signal at the Barclay Downs-Telstar intersection, backed up in the two inner lanes, blocking the Sears intersection; but traffic in the outer or northernmost westbound lane continued without slowing. Drivers in the two inner lanes tended to create an opening for eastbound left turning traffic to cross their path; but drivers making the turn through this opening could not see traffic approaching at speed in the northernmost westbound lane of Fairview Road, and thus a pattern of accidents developed. The speed limit on Fairview Road was thirty-five miles per hour.

Knowing Fairview Road west of Barclay Downs-Telstar would be widened and the median closed all the way to Sharon Road, City planners decided to install temporary controls which would prohibit left turns by eastbound traffic at the Sears intersection. A plan was created which included (i) using barrels to block access to the eastbound left turn lane; (ii) installing overhead signs prohibiting left turns and U-turns; and (iii) placing, in the barrels

closest to the median opening, signs prohibiting both left turns and U-turns. Prohibiting U-turns was necessary because between the Sears intersection and the Barclay Downs-Telstar intersection, another driveway gave access from the northernmost westbound lane of Fairview Road into the Sears Automotive Center parking area.

The barrels, overhead signs, and barrel signs were installed in July of 1985. Although the original plan called for the two barrel signs to be mounted on separate barrels, they were in fact mounted on one barrel with the no left turn sign atop the no U-turn sign. The overhead signs were mounted on a span between two utility poles slightly to the east of the Sears intersection. These signs were approximately eighty-eight and one-half feet away from where the median opening began on the west side of the Sears intersection. The white left turn arrow on the pavement in the blocked off lane was not removed.

In November of 1985, a large truck made an illegal left turn through the Sears intersection and dragged the barrel with the two signs all the way across the westbound lanes of Fairview Road and into the parking area near the Sears Automotive Center. The accident sheared off the upper no left turn sign but left in place the lower no U-turn sign. At the time of plaintiff's accident, the no left turn sign had not been replaced. No City records showed any maintenance work at the Sears intersection between August of 1985 and November of 1986. Nevertheless, except for the accident in which the left turn sign was demolished, there was no evidence of other accidents arising from illegal left turns during the same period.

On 9 November 1986, a clear and dry Sunday, around 1:00 p.m., defendant Talbert drove to the Sears store at Southpark Mall. Inadvertently missing the left turn access to the mall at Barclay Downs-Telstar, he proceeded east on Fairview, intending to turn at the Sears intersection. The barrels described above prevented access to the left turn lane, so defendant Talbert, in the innermost eastbound through lane, drove to the end of the row of barrels, slowing and signalling for a left turn; turned left past them; and stopped at the median opening. The rear part of his 1984 Buick station wagon partially blocked the through lane from which he began his turn. He remained stopped for four to five seconds. He had seen the no U-turn sign on the barrel, but

having no intention of making a U-turn, he looked for a no left turn sign. He never saw the two overhead signs to the east of the Sears intersection.

While stopped, defendant Talbert looked to the left, towards Barclay Downs-Telstar, then to the right, towards the Southpark Mall intersection, and then again to the left. He began to cross westbound Fairview Road but in the center or middle lane collided with a 1984 Honda motorcycle driven by plaintiff Robert Lonon on which plaintiff Linda Lonon was a passenger. Plaintiffs, travelling west on Fairview Road, had previously stopped for the traffic signal at the Southpark Mall intersection, approximately 220 feet west of the Sears intersection. When the traffic light was green, Robert Lonon started forward. He had reached a speed of between thirty and thirty-five miles per hour at the time of the collision, and his motorcycle headlight was burning.

All these events were witnessed by a driver whose car was immediately behind that of defendant Talbert. She testified that when she first saw the motorcycle, it was just coming through the traffic signal at the Southpark Mall entrance, moving in the middle lane of westbound Fairview Road with its headlight burning. As soon as she saw the motorcycle, she looked back at defendant Talbert's car. As he began to turn, she could see the motorcycle. Although plaintiff Robert Lonon swerved to the right, the vehicles collided in the middle lane, the front of the motorcycle striking the right front of defendant Talbert's Buick. Plaintiff Linda Lonon was thrown into the air, fell on her head, and then began crawling to where plaintiff Robert Lonon was lying beside the right front tire of defendant Talbert's car. Plaintiff Robert Lonon suffered severe injury to his back, which resulted in permanent loss of body movement from his shoulders to his feet.

City first contends it was entitled to a directed verdict, and is, therefore, entitled to a reversal of the judgment against it; because (i) City's conduct was not the proximate cause of plaintiff's injury and (ii) plaintiff failed to prove City abused its discretion in the design, installation, and maintenance of the traffic control system at the Sears intersection. In a negligence case, defendant's motions for directed verdict and judgment notwithstanding the verdict raise the same evidentiary question, namely whether the evidence, construed in the light most favorable to plaintiff and giving plaintiff the benefit of every reasonable inference, permits

a finding that defendant was negligent and that his negligence proximately caused plaintiff's injury. *Summey v. Cauthen*, 283 N.C. 640, 648, 197 S.E.2d 549, 554 (1973).

[1] We first address City's argument concerning abuse of discretion as the applicable standard of care and review the law pertinent to City's alleged negligence. In general, to make out a case of actionable negligence, plaintiff

> must introduce evidence tending to show that (1) defendant failed to exercise proper care in the performance of a duty owed to plaintiff; (2) the negligent breach of that duty was a proximate cause of plaintiff's injury; and (3) a person of ordinary prudence should have foreseen that plaintiff's injury was probable under the circumstances as they existed.

*Jordan v. Jones*, 314 N.C. 106, 108, 331 S.E.2d 662, 663 (1985).

Absent a statute imposing liability, cities "acting in the exercise of police power, or judicial, discretionary, or legislative authority, conferred by their charters or by statute, and when discharging a duty imposed solely for the public benefit . . . are not liable for the tortious acts of their officers or agents." *Hamilton v. Hamlet*, 238 N.C. 741, 742, 78 S.E.2d 770, 771 (1953). A city may by ordinance control vehicular traffic on its public streets. N.C.G.S. § 160A-300 (1987). Installing and maintaining a traffic light system constitutes the exercise of a discretionary governmental function. *Hamilton v. Hamlet*, 238 N.C. at 742, 78 S.E.2d at 771; *Talian v. City of Charlotte*, 98 N.C. App. 281, 286-87, 390 S.E.2d 737, 741, *aff'd per curiam*, 327 N.C. 629, 398 S.E.2d 330 (1990); *Rappe v. Carr*, 4 N.C. App. 497, 499, 167 S.E.2d 48, 49 (1969).

That a city has authority to make discretionary decisions does not mean the city is thereby under any obligation. Authority or power to control traffic does not create a mandate of action. *Cooper v. Town of Southern Pines*, 58 N.C. App. 170, 173, 293 S.E.2d 235, 236 (1982). Courts will not interfere with discretionary powers conferred on a municipality for the public welfare unless the exercise or nonexercise of such powers is so clearly unreasonable as to constitute an oppressive and manifest abuse of discretion. *Id.* See also *Riddle v. Ledbetter*, 216 N.C. 491, 493-94, 5 S.E.2d 542, 544 (1939).

A city may waive its immunity from civil liability in tort by purchasing liability insurance. No formal action other than the pur-

LONON v. TALBERT

[103 N.C. App. 686 (1991)]

chase of liability insurance is required to waive immunity from tort liability, and no city is deemed to have waived its tort immunity by any action other than the purchase of such insurance. N.C.G.S. § 160A-485 (1987). "Except where waived under authority of statute the common law rule of governmental immunity is still the law in North Carolina." *Town of Hillsborough v. Smith*, 10 N.C. App. 70, 72, 178 S.E.2d 18, 20 (1970), *cert. denied*, 277 N.C. 727, 178 S.E.2d 831 (1971).

As to traffic control devices, a governmental subdivision which has waived immunity from civil liability in tort may be liable for its negligent failure to conform to a published standard such as the Manual on Uniform Traffic Control Devices ("MUTCD"). *See Jordan v. Jones*, 314 N.C. at 109, 331 S.E.2d at 664. With respect to state roads within municipal corporate limits, traffic signs, signals, markings, islands, and all other traffic-control devices must be installed or erected in substantial conformance with the specifications of the MUTCD. N.C.G.S. § 20-169 (1989). The City of Charlotte is under a more comprehensive self-imposed duty:

> All traffic-control devices shall conform to the manual and specifications approved by the state board of transportation or resolution adopted by the city council. All traffic-control devices so erected and not inconsistent with the provisions of state law or this chapter shall be official traffic-control devices.

Charlotte, NC, Code § 14-57(d) (1985). "Official traffic-control device" means "a sign, signal, marking or device . . . which is designed and intended to regulate vehicular or pedestrian traffic." Charlotte, NC, Charter § 6.21(b) (1985).

In sum, under the rule of *Cooper*, a municipality cannot be held liable for the failure to design, install and maintain a traffic control device unless its actions are so unreasonable as to constitute an abuse of discretion. Nevertheless, under *Jordan*, a municipality which is under a duty to conform its traffic control devices to the MUTCD and which has also waived immunity for civil liability in tort is subject to possible liability for designing or installing a traffic control device not in substantial conformity with MUTCD specifications.

An exception to the doctrine of municipal immunity imposes liability on a city or town for damages resulting from the failure to exercise ordinary care in keeping its streets and sidewalks in

a reasonably safe condition for the purposes for which they are intended. *Hodges v. Charlotte*, 214 N.C. 737, 742, 200 S.E. 889, 892 (1939) (Barnhill, J., concurring). General Statutes, Chapter 160A, codifies this kind of exception:

> (a) A city shall have general authority and control over all public streets, sidewalks, alleys, bridges, and other ways of public passage within its corporate limits except to the extent that authority and control over certain streets and bridges is vested in the Board of Transportation. General authority and control includes but is not limited to:
>
> (1) The duty to keep the public streets, sidewalks, alleys, and bridges in proper repair;
>
> (2) The duty to keep the public streets, sidewalks, alleys, and bridges open for travel and free from unnecessary obstructions[.]

N.C.G.S. § 160A-296 (1987).

As noted in *Hodges*, our courts have consistently distinguished between the governmental or discretionary function of designing, installing and maintaining traffic control devices and the ministerial function of keeping the streets repaired, free from defects and safe for public passage. Our research discloses no North Carolina cases applying subsection (a)(1) of General Statute 160A-296 to a municipality's installation or maintenance of a traffic control device. Nevertheless, where foliage obscured a traffic sign, this Court held that a genuine issue of fact existed as to whether the city was negligent under subsection (a)(2) of the same statute. *Stancill v. City of Washington*, 29 N.C. App. 707, 710, 225 S.E.2d 834, 836 (1976). And where a municipality improved the area bordering both sides of railroad tracks by planting trees and shrubbery and was responsible for pruning the plants which blocked the view of the tracks, the trial court erred in directing a verdict in defendant municipality's favor on the issue of negligence. *Cooper v. Town of Southern Pines*, 58 N.C. App. at 174, 293 S.E.2d at 237. In this context the Court in *Cooper* observed that an obstruction under N.C.G.S. § 160A-296(a)(2) "can be anything, including vegetation, which renders the public passageway less convenient or safe for use." *Id.* The statute, however, prohibits only unnecessary obstructions.

Applying these principles to the evidence adduced at trial, we conclude that the evidence was sufficient to withstand defendant City's motions for directed verdict and judgment notwithstanding the verdict as to breach of duty. Though contradicted by defendant City, plaintiff's evidence suggested that the placement of the overhead "no left turn" and "no U-turn signs," the use of the barrels to close off the lane, and the failure to replace the "no left turn" sign on the barrel at the intersection did not conform to the requirements of the MUTCD. Defendant City having adopted an ordinance mandating compliance with the MUTCD, its failure to comply would be some evidence of negligence. Thus notwithstanding that the decision to close the lane to prohibit left turn traffic in order to reduce early morning accidents was a discretionary one, conflicting evidence of City's compliance with the MUTCD in performing this function raised a question of fact for the jury as to whether City exercised due care.

[2] Defendant City also argues that its negligence, if any, was not the proximate cause of plaintiff's injury as a matter of law in that plaintiff's injury was not a foreseeable consequence of City's negligence and defendant driver's negligence insulated City's negligence. We disagree.

The doctrine of insulating negligence is more easily stated than applied. In *Butner v. Spease and Spease v. Butner*, 217 N.C. 82, 6 S.E.2d 808 (1939), the Court discussed the doctrine as follows:

> "The proximate cause of the event must be understood to be that which in natural and continuous sequence, unbroken by any new and independent cause, produces that event, and without which such event would not have occurred. . . . The test by which to determine whether the intervening act of an intelligent agent which has become the efficient cause of an injury shall be considered a new and independent cause, breaking the sequence of events put in motion by the original negligence of the defendant, is whether the intervening act and the resultant injury is one that the author of the primary negligence could have reasonably foreseen and expected."
>
>      . . . .
>
> The rule is, that if the original act be wrongful, and would naturally prove injurious to some other person or persons, and does actually result in injury through the intervention

LONON v. TALBERT

[103 N.C. App. 686 (1991)]

of other causes which are not in themselves wrongful, the injury is to be referred to the wrongful cause, passing by those which are innocent. *Scott v. Shepherd,* 2 Bl., 892 (*Squib case*). But if the original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission on the part of another or others, the injury is to be imputed to the last wrong as the proximate cause, and not to the first or more remote cause. Cooley on Torts, sec. 50. . . .

The test by which the negligent conduct of one is to be insulated as a matter of law by the independent negligent act of another, is reasonable unforeseeability on the part of the original actor of the subsequent intervening act and resultant injury. *Newell v. Darnell, supra; Beach v. Patton, supra; Hinnant v. R.R., supra; Balcum v. Johnson,* 177 N.C., 213, 98 S.E. 532. "The test . . . is whether the intervening act and the resultant injury is one that the author of the primary negligence could have reasonably foreseen and expected." *Harton v. Tel. Co.,* 141 N.C., 455, 54 S.E., 299. "The law only requires reasonable foresight, and when the injury complained of is not reasonably foreseeable, in the exercise of due care, the party whose conduct is under investigation is not answerable therefor. Foreseeable injury is a requisite of proximate cause, and proximate cause is a requisite for actionable negligence, and actionable negligence is a requisite for recovery in an action for personal injury negligently inflicted." *Osborne v. Coal Co.,* 207 N.C., 545, 177 S.E., 796; *Beach v. Patton, supra.*

*Id.* at 87-89, 6 S.E.2d 811-12. *See also Riddle v. Artis,* 243 N.C. 668, 91 S.E.2d 894 (1956); *Riggs v. Motor Lines and Breeze v. Motor Lines,* 233 N.C. 160, 63 S.E.2d 197 (1951).

While "[t]he law does not charge a person with all the possible consequences of his negligence, nor that which is merely possible," *Phelps v. Winston-Salem,* 272 N.C. 24, 30, 157 S.E.2d 719, 723 (1967), the plaintiff need only prove "that in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission." *Hart v. Curry,* 238 N.C. 448, 449, 78 S.E.2d 170, 170 (1953) (citation omitted).

In this jurisdiction, questions of proximate cause and insulating negligence are for the jury "except in cases so clear there can be no two opinions among men of fair minds . . . whether the

intervening act and the resultant injury were such that the author of the original wrong could reasonably have expected them to occur as a result of his own negligent act." *Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 238, 311 S.E.2d 559, 567 (1984).

Defendant City argues that as a matter of law it was not required to foresee defendant driver's conduct. City posits this contention on the principle that a driver who has the right of way, in the absence of anything which gives or should give notice to the contrary, is not under a duty to anticipate that a motorist approaching would fail to yield the right of way as required by N.C.G.S. § 20-155. This statute requires a driver intending to turn left within an intersection to yield the right of way to any vehicle approaching from the opposite direction that "is within the intersection or so close as to constitute an immediate hazard." N.C.G.S. § 20-155(b) (1989). *See Hudson v. Transit Co.*, 250 N.C. 435, 443-44, 108 S.E.2d 900, 906 (1959). Defendant City argues that if a motorist has the right to assume that all other travelers will observe the law and not turn left until the movement can be made in safety, *Harris v. Parris*, 260 N.C. 524, 526, 133 S.E.2d 195, 197 (1963), then the City is entitled to benefit from the same standard of foreseeability. Defendant City, however, was not in the position of the approaching driver operating a motor vehicle who of necessity must rely on fellow motorists' obedience to the rules of the road.

On the record in this case, the expert testimony as to the effect of the barrels and lack of a "no left turn" sign on the barrel at the intersection leaves room for reasonable minds to differ as to whether the driver's negligent execution of the left turn insulated any negligence on the part of defendant City. The trial court, therefore, did not err in denying the motions for directed verdict and judgment notwithstanding the verdict.

[3] Defendant City also argues in the alternative that the trial judge erred in failing to instruct the jury on the doctrine of insulating negligence, as requested by defendant City. We agree and award a new trial on this basis.

The evidence in this case, in our view, permits the inference that the placement of the barrels and the signs, though negligent, would not have caused injury to plaintiff but for the negligence of defendant driver and that it was reasonably unforeseeable that by closing off the turn lane with barrels, a common traffic channelizing device, a driver would become so confused and excited by

the presence of the barrels as to execute a left turn without looking for oncoming traffic. The purpose of placing the barrels beside the turn lane and of putting the sign overhead was to prohibit left turns and to protect motorists in morning rush hour traffic. No evidence suggests that defendant driver's view of plaintiff's approach was in any manner obstructed by the barrels or that the barrels prevented defendant driver from exercising due care. In this regard the present case is clearly distinguishable from those cases where a governmental authority allowed shrubbery or some other obstacle to obsure a driver's view of a stop sign, thereby preventing the driver from determining which motorist had the right of way and creating the risk of the driver's wrongful conduct. *See Cooper v. Town of Southern Pines*, 58 N.C. App. 170, 293 S.E.2d 235 (1982); *Stancill v. City of Washington*, 29 N.C. App. 707, 225 S.E.2d 834 (1976).

The jury instruction on proximate cause mentioned foreseeability one time and gave little explanation as to the meaning of that term. With proper instructions as to the doctrine of insulating negligence, the jury may have reached a different result, and defendant City was prejudiced by the trial court's failure to give such instruction.

Because we reverse and remand for new trial on this assignment of error, we do not address defendant's remaining assignments.

New trial.

Judges JOHNSON and EAGLES concur.